In The

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

Case No. 25-7143

———————————————

UNITED STATES EX REL. LARRY HAWKIN, RANDALL HAYES, JAMES LOCKLEAR, CLINTON SAWYER, AND KENT NELSON

*Plaintiffs-Appellants*

v.

MANTECH INTERNATIONAL CORPORATION AND
MANTECH TELECOMMUNICATIONS AND INFORMATION SYSTEMS CORPORATION,

*Defendants-Appellees*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

BRIEF FOR RELATOR/PLAINTIFF-APPELLANTS

Joseph A. Hennessey, Esq.
Circuit Cout Bar No. 54011
Attorney for Plaintiff-Appellants
The Law Office of Joseph
Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, MD  20185
240-235-5040
JHennessey@jahlegal.com

CERTIFICATE OF PARTIES AND DISCLOSURE STATEMENT

**A. Parties.**

Appellants Larry Hawkins, Randall Hayes (now deceased and represented by his estate), James Locklear, Clinton Sawyer, and Kent Nelson ("the Mechanics") worked for Appellee ManTech International Corporation (owner of ManTech Telecommunications and Information Systems Corporation) (hereinafter "ManTech") at the Kuwait Maintenance and Sustainment Facility ("KMSF") repairing Mine-Resistant Ambush Protected ("MRAP") vehicles. The Human Trafficking Legal Center is expected to file an *amicus curiae* brief for the benefit of the Court.

**B. Rulings Under Review.**

Mechanics appeal the summary judgment entered by the United States District Court for the District of Columbia (the "District Court") on August 29, 2025, in favor of ManTech and against Mechanics final order disposing of the case (Docs. 143 and 144) and the District Court's dismissal of the False Claims Act claims of Count V of the TAC (Doc. 105, 39-42).

RELATED CASES

*United States ex rel. Elgasim Fadlalla et al. v. DynCorp International, LLC et al.*, Case No. 25-2316, pending in the United States Court of Appeals for the Fourth Circuit, addresses similar issues related to the Trafficking Victims Protection Reauthorization Act and Kuwait's Private Sector Labor Law and Labor Laws. Stayed

in the United States District Court for the District of Columbia is a class action lawsuit filed on the identical facts, *Abernathy et al. v. The Carlyle Group, Inc. et al.*, Case No. 22-3603.

## CORPORATE DISCLOSURE STATEMENT

Appellants are individuals and have no corporate affiliations to report.

**TABLE OF CONTENTS**

CERTIFICATE OF PARTIES AND DISCLOSURE STATEMENT ......................i

RELATED CASES........................................................................................... I

CORPORATE DISCLOSURE STATEMENT ........................................................II

TABLE OF CONTENTS...................................................................................III

TABLE OF AUTHORITIES ......................................................................... IV

GLOSSARY................................................................................................VII

STATEMENT OF JURISDICTION...................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF THE CASE AND DISPOSITION BELOW .............................3

STATEMENT OF FACTS ...............................................................................9

ARGUMENT ..............................................................................................15

    I.    Summary of Argument.................................................................15

    II.   The District Court Violated the Seventh Amendment................................18

    III.  The District Court Abandoning Its Own Law of the Case ........................22

    IV.  The District Court Ignored Its Prior Invocation of *Muchira* .....................26

    V.   The District Court Erred in Inferring Dispositive Facts ...........................27

        A.  Declining a Lower-Paying Job Is Not Dispositive Evidence .............27

        B.  Post-Termination Conduct Cannot Negate the TVPRA Claim ..........28

    VI.  The District Court's Ruling Creates a Legal Vacuum ................................30

        A.  FLSA's Overtime Laws Cannot Be Disclaimed................................31

        B.  Kuwait's Overtime Laws Cannot Be Disclaimed.............................32

        C.  "Choice of Law" Is Never a Choice Between Law and No Law........34

        D.  The District Court's Reasoning Resurrects Rejected Legal Theory ...35

        E.  The District Court Ruling is Belied by its Own Precedent................36

    VII.  The Court Must Reinstate the FCA Claims at TAC, Count V...................38

CONCLUSION ............................................................................................42

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................................45

CERTIFICATE OF SERVICE .......................................................................47

## Cases

*Abernathy et al. v. The Carlyle Group, Inc. et al.*,
No. 22-cv-03603 (D.D.C.) ....................................................5, 8, 16, 20, 21, 23*

*Barrentine v. Ark.-Best Freight Sys., Inc.*,
450 U.S. 728 (1981) ..............................................................................31

*Boots, Inc. v. Prempal Singh*,
649 S.E.2d 695 (Va. 2007)..............................................................8, 23, 31

*Brooklyn Sav. Bank v. O'Neil*,
324 U.S. 697 (1945) ..............................................................................31

*D.A. Schulte, Inc. v. Gangi*,
328 U.S. 108 (1946) ..............................................................................31

*Foley Bros., Inc. v. Filardo*,
336 U.S. 281 (1949) ............................................................................33*

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) ...............................................................................18

*Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*,
512 F. Supp. 3d 1096 (D. Haw. 2021) ...........................................................41

*Javier v. Beck*,
No. 13CV2926, 2014 WL 3058456 (S.D.N.Y. July 3, 2014).........................23

*Kiwanuka v. Bakilana*,
844 F. Supp. 2d 107 (D.D.C. 2012) ................................................................5

*LaShawn A. v. Barry*,
87 F.3d 1389 (D.C. Cir. 1996) (*en banc*)..............................................16, 24*

*Lauritzen v. Larsen*,
345 U.S. 571 (1953) ........................................................................3, 17, 34

*Lochner v. New York*,
198 U.S. 45 (1905) ...........................................................................37, 38

*Lucas v. Guzman*,
Civil Action No. 21-0296 (ABJ) (D.D.C. May 23, 2022) .................18, 33, 38*

*Martinez-Rodriguez v. Giles*,
31 F.4th 1139 (9th Cir. 2022)...................................................................26

*McCulloch v. Sociedad Nacional de Marineros de Honduras*,
372 U.S. 10 (1963) ...............................................................................34

*Muchira v. Al-Rawaf*,
850 F.3d 605 (4th Cir. 2017)........................................................2, 8, 16, 25, 26

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
790 F. Supp. 2d 1134 (C.D. Cal. 2011) ................................................................23

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
286 F. Supp. 3d 430 (E.D.N.Y. 2017) ................................................................23

*Patel v. Garland*,
116 F.4th 617 (6th Cir. 2024)................................................................26

*Ratha v. Phatthana Seafood Co.*,
35 F.4th 1159 (9th Cir. 2022)................................................................18

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) ................................................ 15, 17, 19, 20, 26, 28, 29*

*SEC v. Jarkesy*,
603 U.S. 109 (2024) ................................................................15, 18*

*Sarceno v. Choi*,
66 F. Supp. 3d 157 (D.D.C. 2014) ................................................................31

*Tolan v. Cotton*,
572 U.S. 650 (2014) (per curiam) ................................................15, 17, 19, 22

*United States ex rel. Cody v. ManTech International Corporation*,
No. 13-cv-9173................................................................9, 10*

*United States ex rel. Morsell v. NortonLifeLock, Inc.*,
651 F. Supp. 3d 95 (D.D.C. 2023) ................................................................38

*United States ex rel. Scutellaro v. Capitol Supply, Inc.*,
No. 10-cv-1094, 2017 WL 1422364 (D.D.C. Apr. 19, 2017)........................38

*United States ex rel. Totten v. Bombardier Corp.*,
380 F.3d 488 (D.C. Cir. 2004) ................................................................18,40

*United States v. Dann*,
652 F.3d 1160 (9th Cir. 2011)................................................................23

*United States v. Science Applications International Corporation (SAIC)*,
626 F.3d 1257 (D.C. Cir. 2010) ................................................ 3, 23, 38, 39, 40, 41*

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) ................................................................3, 18, 39, 40, 41

*West Coast Hotel Co. v. Parrish*,
300 U.S. 379 (1937) ................................................................35

**Constitutional Provisions**

U.S. Const. amend. VII (Seventh Amendment) .......................................1, 16, 19, 23

**Federal Statutes**

29 U.S.C. § 213(f) (FLSA overseas exemption).................................................34, 35

31 U.S.C. § 3729(a)(1)(A) (False Claims Act, false claims)..................................42

31 U.S.C. § 3729(a)(1)(B) (False Claims Act, false records)........................3, 19, 42

Trafficking Victims Protection Reauthorization Act,
     18 U.S.C. §§ 1589 *et seq.*..............1-5, 7-9, 16, 18, 21-23, 25-30, 35, 37, 39, 40

**Foreign Statutes**

Kuwait Private Sector Labor Law No. 6 of 2010 ("KPSLL"), Art. 6
     (non-waivability of worker rights)....................................................................32

KPSLL, Art. 32 (end-of-service indemnity)...........................................................14

KPSLL, Art. 51 (paid leave) ...................................................................................14

KPSLL, Art. 64 (maximum working hours)............................................................32

KPSLL, Art. 66 (overtime compensation)...................................................30, 32, 33

KPSLL, Art. 68 (holiday pay)..................................................................................14

KPSLL, Art. 77 (bereavement leave) ......................................................................14

KPSLL, Art. 79 (personal leave) .............................................................................14

KPSLL, Art. 115 (voiding of contrary agreements)..............................32, 33, 36, 37

**Regulations and Contract Provisions**

FAR Clause 52.222-50 (Combating Trafficking in Persons)............................13, 29

U.S. Army Contract No. W56HZV-12-C-0127 (the MRAP Contract)...............9, 11

**Other Authorities**

Restatement (Second) of Conflict of Laws § 196....................................................36

**GLOSSARY**

KMSF    Kuwait Maintenance Support Facility, the U.S. Army facility in Kuwait where Appellants were stationed to perform MRAP vehicle repairs under the ManTech contract.

PPE    Personal Protective Equipment, including respirators, facemasks, and gloves required for safe handling of isocyanates, toluene diisocyanate, and other caustic chemicals to which mechanics were exposed at the KMSF.

Visa 14    A Kuwaiti temporary tourist visa valid for 30 days. ManTech employees were issued Visa 14s upon arrival and were not legally authorized to work in Kuwait on this visa status.

Visa 18    A Kuwaiti work authorization visa (residence permit) authorizing employment. ManTech failed to obtain Visa 18s for its mechanics, leaving them legally exposed to arrest and deportation throughout their employment.

Visa run    An extra-legal practice required by ManTech, directing mechanics to cross into Bahrain or Dubai and re-enter Kuwait to reset a 30-day tourist visa.

v

## STATEMENT OF JURISDICTION

This appeal arises from a Final Order of August 29, 2025 (Doc. 143, with accompanying Memorandum Opinion of the same date, Doc. 144) entering summary judgment in favor of ManTech on the Trafficking Victims Protection Act ("TVPRA") claims made in Count IV of the Third Amended Complaint ("TAC"). Appellants also appeal the non-final Order of June 20, 2023, (Doc. 105) dismissing the False Claims Act ("FCA") claims made in Count V of the TAC.[1] The Mechanics filed their Notice of Appeal twenty-one days after the Final Order of August 29, 2025 on September 18, 2026 (Doc.148). This Court is seized with jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the District Court violated the Seventh Amendment by usurping the jury's constitutionally reserved role to find facts, weigh conflicting evidence, make credibility determinations, and draw reasonable inferences, when it granted summary judgment despite more than 1,500-pages of evidence contesting the material facts ManTech relied upon.

---

[1] The TAC contained two distinct False Claims Act counts. Count I alleged that ManTech submitted false labor-hour claims to the government by manipulating timesheet data in the Army's SAMS-E system. Count V alleged that ManTech falsely certified compliance with the TVPRA and the MRAP Contract's anti-trafficking requirements while continuing to submit invoices and accept payment under a $2.85 billion contract. These are separate theories of liability arising from entirely different conduct. The Mechanics voluntarily dismissed only Count I by stipulation filed July 26, 2023 (Doc. 107), without prejudice to the United States.

2. Whether the District Court committed compound error under Federal Rule of Civil Procedure 44.1 and the Seventh Amendment by (a) declining to determine the content of Kuwaiti labor law, despite the availability of two retained Kuwaiti law experts and a pending offer of as-needed supplemental hearing on Kuwait law legal issues or continuance for that purpose, and (b) using that failure to deprive the Mechanics of their constitutional right to have a jury determine whether ManTech abused that law to obtain their labor in violation of the TVPRA.

3. Whether the District Court abandoned its own law-of-the-case by applying, at summary judgment, a materially more demanding legal standard for establishing TVPRA "serious harm" and coercive intent than it had announcing in legal holdings on three prior occasions when ruling on the same facts and allegations.

4. Whether the District Court misapplied *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017), by invoking only its demanding intent standard while ignoring the same case's recognition that passport confiscation, threats of arrest, and manufactured legal vulnerability are paradigmatic tools of labor trafficking.

5. Whether the District Court drew impermissible inferences in favor of ManTech by treating James Locklear's decision to remain in Kuwait as evidence of the absence of coercion, and by treating the Mechanics post-termination wrongful termination claims as evidence inconsistent with pre-termination coercion.

6. Whether the District Court created an legal vacuum by holding that neither United States law nor Kuwaiti law governed ManTech's overtime obligations, a result

in irreconcilable conflict with the foundational conflicts-of-law principle recognized in *Lauritzen v. Larsen* that choice of law is always a choice between sovereign legal systems, never a choice between law and no law.

7. Whether the District Court erroneously dismissed the Mechanics' False Claims Act claims under Count V of the Third Amended Complaint by applying the non-controlling *Escobar* "specific representations" condition rather than the D.C. Circuit's governing *SAIC* standard, and by failing to analyze Count V's independent claim under 31 U.S.C. § 3729(a)(1)(B).

### STATEMENT OF THE CASE AND DISPOSITION BELOW

After delay caused by extended DOJ intervention deliberations, the District Court lifted the FCA-required seal on the Second Amended Complaint ("SAC") on August 24, 2018.[2] Delays in ruling on case-shaping motions hampered progress in the case.[3] Yet, the District Court consistently upheld the TVPRA claims. In rejecting ManTech's attack on the TVPRA claims in the SAC, the District Court ruled:

---

[2] The Mechanics filed their original complaint on 12/4/15, Doc.1. The Mechanics filed their First Amended Complaint during the pendency of the FCA-required seal. On 6/19/18, after the First Amended Complaint was unsealed, the Mechanics filed the SAC with ManTech's consent. Doc. 30. The SAC was under FCA-seal for two months. With the consent of the District Court, the Mechanics filed the operative Third Amended Complaint on 9/17/21, Doc. 85. The District Court denied the Mechanics' motion to file a Fourth Amended Complaint on 6/20/23, Doc. 105.

[3] Motion to dismiss the Second Amended Complaint filed 01/04/2019 (Doc. 41) and ruled upon 01/28/20 (Doc. 48): 311 days. Motion by Plaintiffs to enforce filed 08/18/20 (Doc 57) and ruled upon 9/30/2021: 410 days. Motion to dismiss the Third Amended Complaint filed 11/16/2021 (Doc. 88) and ruled upon 02/23/2022: 100 days. Motion to file a Fourth amended complaint filed 03/04/2022 (Doc. 95) and denied on 06/20/2023

*[P]laintiffs have stated a plausible claim under the TVPRA. They allege that they feared that if they had left their employment, they would have faced serious harm in the form of high financial penalties or arrest by local authorities. Plaintiffs allege that defendants maintained possession of their passports, required the "visa runs," and did not complete the steps to enable them to remain in Kuwait legally. Plaintiffs were told that if they complained, they would be fired or reported to authorities. In light of the broad scope of § 1589, the Court finds that these facts are enough to state a claim under this provision.[4]*

It also rejected ManTech's motion to dismiss the TAC TVPRA claims:

*The Court finds that the contract penalties for early termination, coupled with ManTech's knowledge and alleged disregard for its employees' fears are enough to state a plausible claim that ManTech abused Kuwaiti law and engaged in a "scheme, plan, or pattern intended to cause" its employees to believe that they would suffer "serious harm" if they did not continue to work for ManTech. 18 U.S.C. § 1589(a). . . ."The confiscation of an immigrant's passport and threats of arrest are common threats of legal process resorted to by traffickers and others who seek to instill fear in persons and force them to labor against their will." Muchira[v. Al-Rawaf ], 850 F.3d [605] at 623. Accepting the allegations in the TAC as true, the Court finds that Count IV states a claim under the TVPRA.* (internal citations, ellipses, brackets, and quotations omitted).

Though not per se part of the *Hawkins* action, the District Court ruled

consistently in related case filed by the Mechanics' co-workers at the KMSF,

---

(Doc. 105): <u>473 days</u>. Motion to dismiss for lack of subject matter jurisdiction filed 08/10/2023 (Doc. 108) and ruled upon 09/27/2024 (Doc. 140): <u>414 days</u>. In addition, Defendants filed the motion for summary judgment on 10/16/2023 and the District Court ruled on it on 08/29/2025, an additional <u>683 days</u>. Thus, total time the Parties have awaited rulings by the District Court: <u>2,391</u> days or 6 years, 6 months, 6 days. In addition, the District Court granted ManTech <u>282-days</u> of extensions. *See* Docs. 22, 27, 31, 50, 51, 83. Total time wherein Plaintiff awaited delays imposed by the Court or ManTech: <u>2,673 days</u> or 7 years, 3 months, 27 days (not counting the delays caused by DOJ requests for extensions). Though the opening sentence of the Memorandum Opinion bemoaned the "decade" that this case has been pending, the District Court failed to acknowledge its own delaying role in its recitation of the procedural history.

[4] *United States ex rel. Hawkins v. ManTech Int'l Corp.*, Civil Action No. 15-2105 (ABJ) (D. D.C. Jan 28, 2020), Memorandum Opinion, Doc. 49 Filed 01/28/20 Page 38 of 40.

*Abernathy et al. v. The Carlyle Group, Inc. et al.*, No. 22-3603 (The Carlyle Group, Inc. purchased ManTech) (the identified related case). The stayed *Abernathy* class action was filed on the exact same factual allegations that the District Court had endorsed as predicates of a TVPRA claim. Rejecting ManTech's motion to dismiss in *Abernathy*, the district ruled that "The Act's legislative history shows that Congress intended for it to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers restrain their victims without physical violence or injury." (internal ellipses omitted, citing *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107 (D.D.C. 2012). Addressing the *Abernathy* Plaintiffs' claim that the "Contract Offer Addendum, Host Nation Sponsorship & Work Visa," which mandated ManTech's mechanics to pay $15,000.00 in penalties in the event that they left Kuwait prior to twenty-four months of service, constituted the type of fear of harm triggering TVPRA liability (the same claim made by the Mechanics in the TAC), the District Court ruled:

> *The Addendum stated that plaintiffs agree to commit to a minimum period of employment (deployment) of 24 months, that the cost for sponsorship is significant, . . . up to and exceeding $10,000 per person for first year and $5,000 for second year, and that employees agree to reimburse ManTech for numerous costs, including the cost to obtain a work visa, travel, lodging, per diem, medical exam(s), background investigation and administration/ administrative fees. It further provided that if they are terminated, they must reimburse employment and deployment costs and costs related to any training or certification process provided.* (internal quotations omitted).

On this factual allegation, the Court stated:

> *Considering all the circumstances alleged in the light most favorable to the plaintiffs, the Court finds that it is plausible to infer that a reasonable person of*

*the same background as plaintiffs would consider the terms of the Addendum as threatening serious financial harm if they left their jobs. Plaintiffs are mechanics who signed a document acknowledging that costs of sponsorship are upwards of $15,000 and agreeing that they would repay certain costs if they quit before completing twenty-four months of service. . . . [T]he FAC alleges sufficient facts to plausibly allege that in these circumstances, plaintiffs reasonably thought the Addendum's repayment terms presented a sufficiently serious financial consequence to compel them to stay in their jobs.* ***The Court holds that the repayment requirement of $15,000 for someone earning $15 per hour states a claim of "serious harm."*** (internal quotations omitted; citing cases; emphasis added).

Armed with the documentary and testimonial evidence supporting each of their particularized allegations, the Mechanics chose <u>not</u> to file a motion for summary judgment. They expressed their preference for a Constitutionally-provided jury trial: "Plaintiffs do not seek summary judgment but, instead, look forward to a public trial before a duly empaneled jury." Opposition to ManTech's Motion for Summary Judgment, Doc.134, Page 2 of 12.

In opposing ManTech's motion for summary judgment, the Mechanics submitted more than 1,500-pages of evidence. *See* PLAINTIFFS' LCvR 7 COUNTERSTATEMENT OF FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ("P, LCvR-7"), Doc. 134-1, Pages 1-1518; and Exhibits filed under seal at Doc. 135. ManTech's statement of facts.[5] Contrary to the representation of the District

---

[5] For the ease of the District Court and consistent with the reason behind LCvR 5.4 (a)'s requirement that documents be searchable, the Mechanics filed their LCvR 7.1 (h) counter-statement and its exhibits as one contiguous, searchable document rather than individually-filed, less accessible exhibits. *Compare* Docs. 124 and 125 with Doc. 134. This searchable document was available for key-word searches by the District Court and is available for use by this Court for that same purpose.

Court, the Mechanics specifically addressed each of Defendants 221 "material" facts upon which ManTech based its motion for summary judgment. P, LCvR-7, Doc. 134-1, Pages 16-51.

On August 29, 2025, the District Court granted ManTech's motion for summary judgment on Count IV, the TVPRA forced labor claim brought pursuant to 18 U.S.C. §§ 1589(a)(3), 1589(a)(4), and 1592. (Doc. 144). On the "abuse of law" claim under § 1589(a)(3), the District Court acknowledged that ManTech had brought the Mechanics to Kuwait on temporary Visa 14s, collected their passports through Millbrook, required repeated visa runs, and thereby "put its employees at risk of significant legal consequences, including arrest." Mem. Op. at 25. In the ruling, the District Court ignored the illegality of the mandated visa runs and the Mechanics' testimony of the fear and helplessness such employer-demanded bad acts inspired, ignored the excessive duration of ManTech's passport confiscation beyond what the Kuwait government required, and ignored the Mechanics' testimony that no prior employer had made them work without proper visas or confiscated their passports. Nevertheless, on the (inaccurate) postulate that ManTech's confiscation of passports, the visa runs, and the lack of proper authority to work from the Kuwait government part of the ordinary course of working in that country, the court found "no evidence tying these practices to an intent on the company's part to force the employees to remain at the company against their will," reasoning that because visa runs were common in Kuwait and Millbrook was nominally pursuing Visa 18s, no jury could find coercive intent. *Id*. at

26. This finding directly contradicts the court's prior ruling sustaining Count IV of the TAC, which quoted *Muchira v. Al-Rawaf*, 850 F.3d 605, 623 (4th Cir. 2017), for the proposition that "the confiscation of an immigrant's passport and threats of arrest are common threats of legal process resorted to by traffickers and others who seek to instill fear in persons and force them to labor against their will," and held that identical factual allegations stated a cognizable TVPRA claim. Mem. Op., Doc. 105, 37.

On the "serious harm" claim under § 1589(a)(4), the court abandoned the federal statutory standard of § 1589(c)(2) and instead evaluated the Sponsorship Addendum under Virginia's liquidated damages framework, *Boots, Inc. v. Prempal Singh*, 649 S.E.2d 695 (Va. 2007), holding that the financial repayment obligation was a legitimate contractual provision rather than an improper threat of harm. Mem. Op. at 34-36. This holding reversed the court's unqualified prior declaration, on the identical addendum and identical factual record, that "the repayment requirement of $15,000 for someone earning $15 per hour states a claim of 'serious harm.'" *Abernathy*, Doc. 36, 33.

The court further held that the Mechanics were not "vulnerable" because of their prior Kuwait experience, Mem. Op. at 37. Forgetting about the $15,000.00 that ManTech had the right to collect from him if he left Kuwait and omitting from its analysis that Locklear's newborn son had spent forty-five days in an intensive care unit, the District Court ruled that James Locklear's decision not to accept a lower-paying Texas position proved that Locklear "had the opportunity to leave and did not take it" and therefore could not have been coerced, *Id*. at 42; and that the Mechanics' post-

termination protests of their wrongful terminations were evidence "inconsistent with their claim that they were forced to work against their will." *Id*. at 44. The court found "no evidence of a factual dispute about the intent element," declining to credit the MRAP Contract's express TVPRA compliance clause, ManTech's own employee admissions of false representations to the Kuwaiti government, the Army contracting officer's finding of violation, or the sworn testimony of all five Mechanics regarding their fear of arrest. *Id*. at 46. Because the § 1589 claim failed, the District Court ruled that § 1592 passport confiscation claim also failed as derivative. *Id*. at 47. Final judgment issued the same day. (Doc. 143).

### STATEMENT OF FACTS

ManTech's liability under the TVPRA arises from ManTech's scheme to exploit labor to become unjustly enriched from United States Army Contract No. W56HZV-12-C-0127 ("the MRAP Contract") (for repair of Mine Resistant Ambush Protected ["MRAP"] vehicles).[6] ManTech won this contract by submitting knowingly unrealistic calculations of labor costs.[7] ManTech then scrambled to both reduce costs and retain

---

[6] ManTech MSJ, Doc. 124-2, D.Ex.01.

[7] P, LCvR-7, 134-1, PEx.E, *United States ex rel. Cody v. ManTech International Corporation*, No. 13-cv-9173, False Claims Act Complaint, ¶¶17-21, 49.

its workforce[8] by cutting its mechanics' compensation[9] while, at the same time, intimidating and instilling fear at the KMSF to keep the Mechanics in Kuwait.[10] ManTech brought its mechanics' passports from them,[11] refused to take the steps necessary for the mechanics to have the authorizations required from the Kuwait government to work legally in Kuwait.[12] ManTech refused to pay the Mechanics

---

[8] P, LCvR-7, Doc. 134-1, PSOF 3, 9 of 1518; *Id*. at PEx. F, Trial Transcript, *United States ex rel. Cody v. ManTech International Corporation*, No. 13-cv-9173 at Tr. 574-575 (Kevin Cody) (after acknowledging that ManTech could not retain staff through salary, stated ManTech's intention to keep the mechanics in Kuwait by other means ("Whoever won the contract, whoever was awarded the contract would have what it took to *keep the people there on the ground* to fix those vehicles in the time they needed to be fixed.") (emphasis added).

[9] *Id*. at 536-37 wherein he describes the "dramatic" and "drastic" cuts that ManTech made to its mechanics' compensation.

[10] P, LCvR-7, Doc. 134-1, Response to Defendants' Statement of Fact, 153-154; *Id*. at 1436 of 1518, Randall Hayes Answer to ManTech Interrogatory No. 14, PEx.II, Page 1436: ManTech Manager Bud Delano told Plaintiff Randall Hayes "not to venture out of his apartment on his time off so as to avoid the possibility that he would be arrested."

[11] *Id*. Hayes only received his passport back for the limited purpose of executing an illegal "visa run" at ManTech's demand. After returning from his illegal visa run, Millbrook confiscated Hayes's passport again. *See also* P, LCvR-7, PEx.MM, Page 809, Larry Hawkins Deposition, 104:7-17 ("A visa run is when you have to get an extension on your visa because you have not -- because you have gone past the 30 days' time limit. So you have to get your passport back in order to go out and come back in again. And once you do that, then you're supposed to get your passport back because you can't be in country without any documentation. You have to have your passport. But unfortunately with ManTech, they did not return the passports. They kept the passports.". *See* P, LCvR-7, Doc. 134-1, PEx.O, 883, Kent Nelson Deposition, 55:13-56:9. P, LCvR-7, Doc. 134-1, PEx.CC, Pages, 1337-1339, Clinton Sawyer Answer to ManTech Interrogatory 7.

[12] P, LCvR-7, 134-1, PEx. NN, Page 1491, James Locklear Answer to ManTech's Interrogatory No. 11, "When he worked for ITT, the Visa 18 he received was issued after only a month. However, Relator Locklear never received a Visa 18 from ManTech.

overtime that was due to them under Kuwait and U.S. law[13]; forced them to work in

unconscionable conditions[14]; refused to spend money on personal protective equipment

that would have protected them against caustic, dangerous fumes and smoke;[15] made

---

. . . Thus, Relator Locklear lived in fear that he would be arrested by Kuwaiti authorities for working without a Visa 18."

[13] *See* P, LCvR-7, 134-1, Objection 9, Page 5 of 1418 as evidenced by ManTech MSJ, Doc. 124-2, D.Ex.01., Contract No. W56HZV-12-C-0127, "Contractor shall adhere to and abide by all Kuwait Labor Laws during the performance of this contract." MANTECH- 00051415. Kuwait's Private Sector Labor Law required the payment of overtime. P, LCvR-7, 134-1, PEx.B, Page 95, 86, Art. 66. The other employers paid overtime. P, LCvR-7, 134-1, PEx.N, 861. Deposition of Clinton Sawyer, 100:14-21.

[14] In an almost spiteful weighing of evidence in favor of ManTech, the District Court made much of Defendants' claim that "Outside of work, plaintiffs either lived in their own apartments or in apartments provided by ManTech. . . Hayes had maids clean his apartment and told a friend that he exercised at a gym[.]" Yet, the Mechanics made clear that the condition of the living quarters was irrelevant *as they were almost never in their living quarters*. P, LCvR-7, 134-1, 57-59 citing DEx. 11, Locklear Depo at 87:9-93:22. ManTech, illegally, worked them 12-hours a day, 6-days a week. Locklear testified that he arose at 3:00 a.m., boarded a ManTech-provided bus at 4:00 or 4:30 a.m. to be driven 30 minutes to the KMSF. There, he worked until 7:00 p.m., arrived back at his living quarters at 8:00 p.m. and began sleep from 9:30-10:00 p.m." He only used his apartment to sleep and wash the black soot off. KMSF employee April Lowery's testimony captured some of the conditions, DEx. 9, 31:12-38:20:

> *And as soon as you, like, start walking towards the bay door . . . you're hit with the smell of . . . Soot just from the metal shavings and everything that was just dispersed into the air, it was all black. . . . Yeah, I mean, it was all over us. . . . [A]ll that haze and smoke and whatever, everything, all the particles up in the air would come down and, of course, it would land on everything. . . . all that smoky haze that would just cover the entire facility, it was very hard to see all the way at the end of the facility because of the smoke. . . . it was bad every day, all day long, it was bad, just -- I can't even . . . express how bad it was.*

[15] P, LCvR-7, 134-1, Doc. 134-1, PSOF 14, Page 12 of 1518; PEx.M, 814-815, Larry Hawkins Deposition, 123-126, "For some reason when ManTech took over the contract, the PPE portion of it went away. The personal protection equipment, that went away. I mean, we inquired about it. We asked. We asked about it because we wanted to know, Hey, where is my PPE? Where is my facemask? Where is my respirator? Where are my hand gloves? And the comment was, Hey, if you need that stuff, you have to go

the Mechanics subject to more than $15,000.00 in penalties if they left Kuwait prior to 24-months of service[16]; enhanced the Mechanics' fear of arrest through public meetings[17]; and accentuated the Mechanics' fear[18] of incarceration and summary deportation.[19] The fear of arrest deliberately instilled in the Mechanics by ManTech

get it yourself. We don't provide that. I don't know if it wasn't in the budget or what it was. I don't know."

[16] *See* ManTech MSJ, DEx. 21, Doc. 124-16, Page 8 of 8, ManTech MRAP-FOV Contract Offer Addendum, Host Nation Sponsorship & Work Visa (CIVIL ID). *See also* ManTech MSJ, DEx.21, 7, MRAP-FOV Contract Offer Addendum, Contract Mandated Training Certification (additional amounts owed to reimburse ManTech for training) .*See* generally P, LCvR-7, Doc. 134-1 Page 24-25. The $15,000 penalty was written into the Mechanics' ManTech contract before ManTech even knew how much paying a "sponsor" would cost. See Hayes Dep. at 116–17 (recounting how the ManTech supervisors invoked the penalty to discourage the Mechanics from leaving Kuwait: "if you asked something and it was what they thought was very serious . . . their answer was, Well, if you don't like it, leave . . . But you remember you got to pay back this amount of money.").

[17] P, LCvR-7, 134-1, Refutation of Defendant's Statement of Material Facts 193-194, p. 56; *Id*., PEx.II, Page 1439-40, Randall Hayes Answer to ManTech Interrogatory No. 22, "ManTech manager Marvin Holt was arrested by Kuwaiti authorities for not possessing his passport or adequate documentation of his legal status when he was stopped at a check-point. Relator Hayes knows that because Mr. Holt . . . was required to provide a mandatory briefing to the other contractors at the KMSF, including to ManTech's employees, about the risk of not possessing one's passport and adequate legal documents verifying one's citizenship and legal status in Kuwait. Incredibly, even after Mr. Holt's arrest – and the public warning that Mr. Holt was required by SAIC to give to others at the KMSF – ManTech did not change its policy regarding its possession of its employees' passports."

[18] P, LCvR-7, Doc. 134-1, PEx.FF, Randall Hayes Answer to Interrogatory No. 23, 1394 "Moreover, given that ManTech had confiscated his passport, Relator Hawkins was reluctant to venture out into Kuwait for medical consultations given the risk of arrest."

[19] P, LCvR-7, Doc. 134-1, Page 1491, PEx.NN, James Locklear Answer to ManTech Interrogatory No. 13, "Relator Locklear lived under constant fear of being arrested. . . . Kuwait authorities were eager to arrest and make an example of expatriates who broke

was accentuated by the Mechanics' knowledge that ManTech's behaviors were reckless and wanton.[20] The MRAP Contract expressly barred the misconduct complained of by the Mechanics.[21] ManTech's management actively concealed these

Kuwait's laws. . . . Relator Locklear knew that when Americans were arrested they were beaten on the soles of their feet. . . . [W]hen Americans got arrested for immigration violations they were deported – kicked out of the country, placed on a list and never allowed to come back. Relator Locklear feared that he would be arrested each time he was in transit between his ManTech-provided housing to the KMSF and when he embarked on a visa run."; *Id*. PEx.O, 885, Deposition of Kent Nelson, 63:8-14. "You had asked if I had any stresses working there. That would be one of them, is being arrested or if you're working illegally in the country and they find out about you, you never know if they're going to be knocking on your door or walking down the street and they'll find you or whatever."

[20] P, LCvR-7, Doc. 134-1, PEx.NN, Page 1491, James Locklear Answer to ManTech Interrogatory 13: "Due to his work with ITT, Relator Locklear knew that though a 'fresh' tourist visa entitled a non-Kuwaiti to visit Kuwait, it did not entitle that person to work in Kuwait. Thus, Relator Locklear lived in fear that he would be arrested by Kuwaiti authorities for working without a Visa 18." And 1591: Locklear knew "that the Kuwait authorities were eager to arrest expatriates. . . . The Kuwait government's unsparing treatment of them was, in Relator Locklear's mind, intended to send a message of deterrence to those, such as the ManTech employees at the KMSF."

[21] *See* P, LCvR-7, Doc. 134-1, PSOF 14, citing ManTech MSJ, ManTech MRAP Contract, DEx.1, 96-97 of 112, Sec. I-166, KSCR1-2 (C3), ("Contractor . . . shall comply with all . . . Trafficking in Persons policies [including the] prescriptions and remedies at FAR Clause 52.222-50[.] . . . [and] shall . . . abide by all Kuwait Labor Laws[.]"; *Id*. at C-3 (a), 49 of 119 ("All contractors . . . are reminded of the prohibition . . . against . . . removing, confiscating, or possessing any . . . passport . . . to prevent or restrict or attempt to prevent or restrict, without lawful authority, the persons (sic) liberty to move or travel, in order to maintain the labor or services of that person."). *Id*., C-3 (b)(1), "Contractor shall only hold employee passports and other identification documents discussed above for the shortest period of time reasonable for administrative proceeding purposes." *Id*., C-3 (b)(6), "Contractors shall comply with International and Host Nation laws regarding transit/exit/entry procedures, and the requirements for visas and work permits." *Id*., C-3 (c), "Contractors have an affirmative duty to advise the Contracting officer if they learn of their employees violating the human trafficking . . . provisions . . . [C]ontracting officers and/or their representatives will conduct random

misdeeds.[22] Plaintiffs were damaged by the exhausting 72-hour workweek; the health-effects of acute and chronic exposure to isocyanates, toluene diisocyanate, and other chemicals; the theft of lawfully-owed wages[23]; the emotional distress of living without the protection of any country's laws and in fear of imminent arrest,[24] incarceration, criminal prosecution, and summary deportation.[25]

---

checks to ensure contractors and subcontractors at all tiers are adhering to the law on human trafficking, human living conditions and withholding of passports."

[22] P, LCvR-7, Doc. 134-1, PSOF 7, Page 10 of 1518, detailing how ManTech knew that working the Mechanic 72 hours a week was a violation of Kuwait's laws; *Id*., PSOF 10 (detailing ManTech and Millbrooks efforts to falsely represent to the Kuwaiti government that the Mechanics worked for Millbrook so as to conceal ManTech's violation of Kuwait's immigration and labor laws). *See also* previously sealed Document 135-2, Page 2 of 12 capturing ManTech's attempt to conceal its violation of Kuwait's labor laws behind a false representation of Kuwait labor law.

[23] ManTech denied their right to an end-of-service indemnity payment per Kuwait's Private Sector Labor Law Art. 32, 51 (Doc. 134-1, PEx.B, page 85 and 91), paid time off or overtime for working on national holidays (Art. 68 (PEx.B/96-97); paid bereavement pay, Art. 77 (PEx.B/99); paid personal time, Art.79 (PEx.B/99).

[24] P, LCvR-7, Doc. 134-1, PEx.CC, Clinton Sawyer Answer to ManTech Interrogatory No. 7, at 1338. "Relator Sawyer complained to his supervisor Joe Mitchell that it was illegal to do a visa run and that taking his passport and other credentials placed Relator Sawyer in danger of being arrested by Kuwaiti authorities. Relator Sawyer's complaints were ignored. On March 30, 2013, ManTech instructed Sawyer, still without a Visa 18, to execute a 'visa run.' . . . ManTech again ignored this warning and ordered Relator Sawyer and the others in the group to proceed with the one-day 'turn and burn' (visa run) as scheduled or be fired. . . . Relator Sawyer had become friends with other expats . . . Relator Sawyer learned from these sources . . . that it was illegal for him to work in Kuwait without a Visa 18 – and that he was in danger of being arrested and summarily deported from Kuwait[.]"

[25] Relator Hayes lived in fear that Kuwaiti authorities would raid the KMSF and discover that so many expats were working in Kuwait without proper visas or work permits. The entire expat community was aware of how aggressively Kuwait enforced its prohibition on working in that country without proper authorizations as foreigners were constantly being arrested at checkpoints. Relator Hayes was also concerned that

I. **Summary of Argument.**

The District Court violated the Seventh Amendment. The Constitution assigns to the jury, not the judge, the power to weigh conflicting evidence, assess witness credibility, and draw inferences from contested facts. Confronted with thousands of pages of evidence contesting material facts ManTech asserted, the District Court usurped each of those functions for itself and, impermissibly resolved them in the moving party's favor. That is the precise constitutional wrong the United States Supreme Cour has prohibited in *Reeves v. Sanderson Plumbing Products* and *Tolan v. Cotton*, and one the Supreme Court's recent decision in *SEC v. Jarkesy*.

The District Court compounded its Seventh Amendment violation through a related procedural failure. Federal Rule of Civil Procedure 44.1 assigns to the court the obligation to determine what foreign law provides and to instruct the jury accordingly; it is then the jury's constitutional function, recognized in *United States v. Gaudin*, to determine whether the defendant violated that law. Despite the availability of retained Kuwaiti law experts and the Mechanics' express willingness to make those experts

---

he did not have his U.S. passport on him because he would be able to, in an emergency situation, be able to prove his American citizenship. . . Given the large number of persons employed illegally at the KMSF, given Marvin Holt's arrest, and given the harassment that Relator Hayes and others received from Kuwait authorities merely by entering the country from Bahrain prior to the passage of 72 hours, Relator Hayes lived in constant fear that Kuwaiti authorities, once alerted to the existence of illegals at the KMSF, would raid the facility. P, LCvR-7, Doc. 134-1, 1433-1437, Randall Hayes Answer to ManTech's Interrogatory No. 14.

available to the District Court for additional questioning, the District Court reneged on its obligation to determine Kuwaiti law. Having refused its Rule 44.1 function, the District Court then used that refusal to eliminate the jury's role entirely, leaving the Mechanics in a legal purgatory where no sovereign's law applied and ManTech's own contractual disclaimers filled the void.

The District Court abandoned its own law of the case. In three prior rulings, including the related *Abernathy* action, the court upheld the Mechanics' TVPRA claims on the identical factual record and declared, without qualification, that a $15,000 repayment obligation imposed on a mechanic earning $15 per hour states a claim of serious harm. At summary judgment, the court discarded that standard and substituted one rooted in Virginia contract law. Under *LaShawn A. v. Barry*, a court may not raise the bar at the dispositive stage against the very party who organized its evidence to meet the standard the court had announced.

The District Court misread its central authority. *Muchira v. Al-Rawaf*, the case on which the court relied for its demanding intent standard, also described in that same passage the exact conduct present here, *i.e.*, passport confiscation, threats of arrest, manufactured legal vulnerability, as paradigmatic evidence of labor trafficking. The District Court applied the demanding half of *Muchira* while ignoring its descriptive half. Whether the Mechanics' evidence of intent crosses *Muchira*'s threshold is a question for a jury, not a question the District Court was empowered to resolve against the Mechanics as a matter of law.

The District Court drew impermissible inferences in the moving party's favor on two distinct points: that James Locklear's economically compelled decision to remain in Kuwait rather than accept a lower-paying domestic job proved absence of coercion, and that the Mechanics' post-termination wrongful termination claims proved they had not been coerced during employment. Under *Tolan* and *Reeves*, both inferences are to be made *against* the moving party, ManTech, and in favor of the Mechanics. Both are inferences that must be left to the jury.

The District Court created a legal vacuum. It held that neither U.S. law nor Kuwaiti law governed ManTech's overtime obligations — a result that allowed ManTech to invoke the FLSA's overseas exemption to escape American law while simultaneously denying that Kuwaiti law, the sole predicate for that exemption, imposed any obligation in its place. That result is irreconcilable with the foundational conflicts principle recognized in *Lauritzen v. Larsen* that choice of law is always a choice between legal systems, never a choice between law and no law — and with the District Court's own ruling in *Lucas v. Guzman*, which held that FLSA wage rights survived a formal written release - a protection the court here denied to workers who had no counsel, no union, and no passport.

The District Court dismissed the Mechanics' False Claims Act claims by applying the wrong legal standard and by ignoring an independent statutory predicate the Mechanics expressly pled. Under the controlling D.C. Circuit standard in *United States v. Science Applications International Corp.*, a payment demand alone suffices

where the contractor withheld information about material noncompliance. The District Court found twice that TVPRA compliance was material to payment; ManTech kept billing while violating those requirements. Dismissal was error. The independent false records claim under 31 U.S.C. § 3729(a)(1)(B), which *United States ex rel. Totten v. Bombardier Corp.* holds is designed precisely for those who conceal noncompliance without themselves presenting the invoice, was never analyzed at all. Count V must be reinstated on both grounds.

## II.    The District Court Violated the Seventh Amendment.

The Seventh Amendment preserves the right to a jury trial for all claims that are "legal in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54-55 (1989). Civil claims under 18 U.S.C. § 1595, the TVPRA's private right of action seek legal remedies in tort. *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1171 (9th Cir. 2022). The TVPRA plaintiff seeks compensatory damages, restitution, and attorneys' fees — the quintessential legal remedies. 18 U.S.C. §§ 1593, 1595. Accordingly, the Seventh Amendment extends to the Mechanics' TVPRA claims.

Per *SEC v. Jarkesy*, 603 U.S. 109 (2024), the Seventh Amendment demands a jury trial on liability for conduct analogous to common-law fraud (applying *Granfinanciera*). Similarly, when a District Court judge, at summary judgment, performs the functions the Constitution reserves to the jury, it removes from "the jury [the] central role [that] is a constitutional one that cannot be dispensed with." *Id.* at 131. As the Supreme Court has instructed, "in entertaining a motion for judgment as a

matter of law, the court should review all of the evidence in the record. In doing so, however, *the court must draw all reasonable inferences in favor of the nonmoving party*, and it may not make credibility determinations or weigh the evidence." *Reeves v Sanderson Plumbing Products*, 530 U.S. 133, 150 (2000) (emphasis added). Indeed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves* at 151. The Mechanics did not move for summary judgment; thus, the District Court was required to give credence to the Mechanics on *all* the evidence proffered by ManTech. In *Tolan v. Cotton*, 572 U.S. 650 (2014) (per curiam), the Supreme Court *summarily* reversed the Fifth Circuit because it had "failed to view the evidence at summary judgment in the light most favorable to [the non-moving party] with respect to the central facts of this case. By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly weighed the evidence and resolved disputed issues in favor of the moving party." *Id*. at 657 (internal citations and quotations omitted). When a District Court substitutes its view of the evidence for the jury's it violates the Seventh Amendment.

For example, the Mechanics presented substantial evidence that ManTech deliberately instilled fear of arrest in them. *See* Footnotes 17-20, 24, 25, *supra*. The Court discounts the Mechanics' testimony by stating, "None of the plaintiffs were arrested or deported during the time they worked for ManTech". Mem. Op. 8. In other words, the logic of the court is that *because* none of the Mechanics had been arrested

during the time they worked for ManTech, their *fear of being arrested* should be discounted. Yet, it is impermissible – if not unconstitutional – for the judge to make that inference in the place of a jury.

The District Court also relied on evidence that "[S]ome of them had carried out visa runs and worked on temporary visas for previous employers." The weight of this too is for the jury to weigh against the evidence that ManTech's conduct was unlike any prior Kuwait-based employer. *See* Footnotes 12, 13, 20, 24, *supra*. A reasonable jury might find a coercive environment on these facts. As the District Court *itself* has already ruled, "The Court finds that the contract penalties for early termination, *coupled with ManTech's knowledge and alleged disregard for its employee's fears* are enough to state a plausible claim that ManTech abused Kuwaiti law and engaged in a 'scheme, plan, or pattern intended to cause' its employees to believe that they would suffer 'serious harm' if they did not continue to work for ManTech." Mem. Opp. *Abernathy*, Doc. 36, 35-37.

In another example, the Court sides with ManTech by stating, "there is no evidence tying these practices to an intent on the company's part to force the employees to remain at the company against their will[.]" Mem. Opp. 26. However, circumstantial evidence of intent is evidence and it must be credited at summary judgment. *Reeves*, 530 U.S. at 147 ("[C]ircumstantial evidence . . . may be more certain, satisfying and persuasive than direct evidence."). The MRAP Contract prohibited the exact conduct the Mechanics have submitted evidence of that ManTech perpetrated. *See* Footnote 21.

Indeed, ManTech's own employee admitted the representations to the Kuwaiti government were false. *See*. PSOF 11, 12. The Army's contracting officer found ManTech in violation of Kuwait law. Doc. 134-1, PSOF 7, 10 (including PEx.H, Doc. 134-1, 651-653; PEx.J, 134-1, 656-658; and PEx.K, Doc. 135-2; 2, K, 135-2 [providing notice that ManTech knew, in fact, that its work hours and refusal to pay overtime were in violation of the law]). A jury could reasonably infer from these facts that ManTech knew its conduct was prohibited, knew it created illegal immigration vulnerability, and exploited that vulnerability to maintain a captive workforce.

Incredibly, the District Court ruled that "Plaintiffs failed to present a genuine dispute that the repayment provisions in the contract posed improper financial penalties." In ruling on the exact same factual predicates by the same category of ManTech KMSF employees in *Abernathy* the District Court doubled-down on this statement of the law, unambiguously establishing, "The Court holds that the repayment requirement of $15,000 for someone earning $15 per hour states a claim of 'serious harm.'" *Abernathy*, Case No. 22-cv-03603, Doc. 36, 33.

Despite the evidence substantiating the $15,000.00 repayment obligation, the District Court fashioned a *new* legal test at summary judgment relying on Virginia contracts law rather than the TVPRA. Ignoring evidence that ManTech set the repayment obligation before knowing the sponsor's actual charges, the District Court found that under Virginia law, the Sponsorship Addendum was a valid liquidated damages clause. *See* P, LCvR-7, 134-1, 24. The court characterized this as a "warning

of adverse but legitimate consequences." Mem. Op. at 35. Whether the penalty invocation was a legitimate warning or an improper threat is a jury question, especially when the court had three times previously established those same financial provisions as cognizable TVPRA threats of serious harm.

As one more example of the District Court encroaching on the province of the jury, it held that plaintiffs were not "vulnerable" because they were experienced mechanics who had previously worked in Kuwait. Mem. Op., 37. That conclusion rests on an inference drawn in ManTech's favor — in direct violation of *Tolan* — and it reflects a misallocation of constitutional authority. The determination of what a reasonable person of the same background would believe, 18 U.S.C. § 1589(c)(2), is precisely the inquiry the Seventh Amendment reserves to the jury. Whether prior Kuwait experience made the Mechanics less susceptible to fear or more susceptible because they knew firsthand how aggressively Kuwait polices its immigration laws is a contested factual inference. A reasonable juror might readily reach the *opposite* conclusion: that a mechanic who has worked in Kuwait before knows exactly how dangerous it is to be undocumented there. *See* Footnotes 12, 13, 17-20, 24, *supra*. Whether prior experience counseled calm or heightened the Mechanics' apprehension is a jury determination.

### III.   The District Court Abandoning its Own Law of the Case.

Rather than applying *Muchira*'s intent standard to the evidentiary record with all inferences drawn in plaintiffs' favor, the District Court used that standard to impose

what amounted to a directed verdict on intent, finding no evidence of coercive purpose even in the face of: (1) a contract that expressly prohibited ManTech's conduct; (2) admissions from ManTech's own employee that representations to the Kuwaiti government were false; (3) an Army finding that ManTech was violating Kuwait law; and (4) the Mechanics' own sworn testimony that they felt coerced by ManTech.

The court erroneously applied Virginia contract law under *Boots, Inc. v. Prempal Singh*, 649 S.E.2d 695 (Va. 2007), to evaluate whether the financial penalty provisions constituted "serious harm" under 18 U.S.C. § 1589(c)(2). Mem. Op., 35. This state contract law framework did not appear in any of the District Court's three prior articulations of TVPRA law where the District Court repeatedly held that ManTech's conduct, if backed by evidence, was sufficient to establish TVPRA "serious harm." None of the cases cited by the District Court turn on whether the provision was enforceable under state contract law.[26] Instead, they ask whether the threatened financial harm was sufficiently serious, under a totality of circumstances, provide a

---

[26] The District Court cited *United States v. Dann*, 652 F.3d 1160, 1170–71 (9th Cir. 2011) (employer's threat that a foreign worker would owe $8,000 if she quit constituted threat of "serious harm" under the TVPRA); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 437–38 (E.D.N.Y. 2017) (where the contract provided for a $25,000 termination fee, court found that the fee constituted "serious harm" and therefore, plaintiff stated a claim under the TVPRA); *Javier v. Beck*, No. 13CV2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (threatened enforcement of $15,000 confession of judgment constitutes threat of serious harm); *Nunag–Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (threatened payment of $10,000 constitutes threat of serious harm). *Abernathy*, Doc. 36, 33.

reasonable jury the grounds to find impermissible coercion. In short, the District Court substituted a different legal test at summary judgment and reached a different result on the same facts.

Section 1589(c)(2) defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." This is a federal statutory standard, applied through a mixed subjective-objective inquiry that incorporates the victim's "particular vulnerabilities." *Muchira*, 850 F.3d at 618.

The District Court converted this federal inquiry into a state contract law question. It asked not whether the financial penalties were "sufficiently serious under all the surrounding circumstances to compel a reasonable person" to remain at work, but whether the addenda constituted improper liquidated damages. *Boots, Inc. v. Prempal Singh*, 649 S.E.2d 695, 697 (Va. 2007). Mem. Op.,15–16.

> This Court has ruled that
>
> *[T]he most basic principle of jurisprudence is that we must act alike in all cases of like nature. Two time-honored doctrines help put that principle into practice. The first is the law-of-the-case doctrine: the same issue presented a second time in the same case in the same court should lead to the same result. The second is the law-of-the-circuit doctrine: the same issue presented in a later case in the same court should lead to the same result.*

*See LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) (*en banc*).

Given the District Court's prior rulings on what constitutes serious harm under the TVPRA, the burden on the Mechanics, the non-moving party, to bar summary judgment and allow the jury to consider the evidence of TVPRA harm is the presentation of the *evidence* of this onerous repayment requirement. This evidence was provided and supplemented by documents establishing that the $15,000 sponsorship penalty was written into the Mechanics' ManTech offer letter *before* ManTech even knew how much it would pay its "sponsor" and evidence that the ManTech managers used the penalty to discourage the Mechanics from leaving Kuwait. *See* Footnote 16. Having announced the law-of-the-case, the District Court may not apply a more demanding legal standard at summary judgment than at the pleading stage where the evidence proffered by the non-moving party confirms rather than contradicts the allegations.

**IV.    The District Court Ignored Its Prior Invocation of *Muchira*.**

*Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017), is the central authority in the MSJ opinion. But the District Court applied only one side of *Muchira* - its demanding intent standard - while ignoring the case's own acknowledgment of what TVPRA violations look like in practice. In the very passage the District Court quoted in June 2023 to sustain Count IV, *Muchira* stated: "[t]he confiscation of an immigrant's passport and threats of arrest are common threats of legal process resorted to by traffickers and others who seek to instill fear in persons and force them to labor against their will." *Id*. at 623. That sentence describes this case precisely. However, in siding with ManTech by entering summary judgment in its favor, the District Court cited *Muchira* only for the demanding intent standard, without acknowledging that the facts in this record *e.g.*, passport confiscation, threats of arrest, a contract prohibiting the conduct - evidence that maps directly onto *Muchira*'s own description of trafficking. *Patel v. Garland*, 116 F.4th 617 n.1 (6th Cir. 2024) ("Traffickers frequently confiscate the travel documents of their victims.").

Moreover, *Muchira*'s holding that "abuse of law" requires "knowing[]" use of legal process "as a means to coerce" does not require direct, documentary evidence of coercive intent. 850 F.3d at 622–23. Intent frequently proved circumstantially. Where an employer's own contract prohibits the conduct it engaged in, its own employee admits to fraudulent misrepresentations, and the sponsoring government agency finds the employer in violation of host-nation law, a jury may reasonably infer that the

employer knew its conduct created legal vulnerability and exploited it. *See Reeves*, 530 U.S. at 147; *cf. Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1155 (9th Cir. 2022) (TVPRA causation "requires a proximate causal link between one or more of the unlawful means enumerated in § 1589(a) and the labor actually obtained").

The District Court's interpretation - requiring near-direct evidence that the visa mechanism was specifically selected for its coercive rather than administrative value - is too demanding and is inconsistent with Congress's intent to address 'increasingly subtle methods of traffickers." H.R. Rep. No. 106–939, at 101 (2000). An employer can simultaneously pursue pretextual or facially valid administrative goals and knowingly exploit the resulting legal vulnerability to retain labor. These aims are not mutually exclusive, and the jury, *not the court*, should decide which inference the evidence supports.

**V.   The District Court Erred in Treating Locklear's Declination of a Lower-Paying Job as Evidence of Absence of Coercion, and in Treating Plaintiffs' Post-Termination Conduct as Inconsistent with Pre-Termination Coercion.**

A.   <u>Declining a Lower-Paying Job Is Not Evidence of Absence of Coercion</u>.

The District Court held that because Locklear "had the opportunity to leave and did not take it, a reasonable fact-finder could not find he was coerced to provide his labor at the KMSF." Mem. Op. at 26. This conclusion rests on a factual premise, that the Texas position was a genuine free alternative, and a legal inference, that declining it proves absence of coercion. Both are wrong.

James Locklear earned money, not just for himself, but for his family. He testified about his son being in intensive care for 45-days because he could not breathe on his own. ManTech MSJ, DEx.11, Deposition of James Locklear, 60:20-21. ManTech offered a Texas position at substantially lower pay. Locklear declined because the pay cut was unacceptable. DSOF ¶¶ 164–65. The District Court characterized this as proof that Locklear "had the opportunity to leave" and freely chose to stay. But a worker cannot be said to be free of coercion simply because his employer offers him a lower-paying job elsewhere. The TVPRA does not require victims to accept inferior alternatives to establish coercion at their primary worksite. Under the District Court's logic, any employer could insulate itself from TVPRA liability by offering coerced workers a worse alternative and arguing that their refusal proves they are content. That cannot be the law.

The District Court was not empowered to draw inferences in favor of ManTech, the moving party, on the meaning of Locklear's decision not to take a lower paying job. Whether Locklear's rejection of the Texas offer reflected genuine contentment at the KMSF or the calculation of a worker trapped between inadequate alternatives with dependents whose very life might depend on Locklear's income is a classic jury question. Under *Reeves*, the court was required to draw the inference in plaintiffs' favor: that Locklear stayed in Kuwait not because he was free but because the alternative was financially untenable and the coercive conditions at the KMSF continued throughout. 530 U.S. at 150.

B.    <u>Post-Termination Conduct — Protesting a Wrongful Termination and Seeking Reemployment — Is Legally Consistent with Pre-Termination Coercion and Cannot Negate the TVPRA Claim</u>.

The District Court relied heavily on plaintiffs' post-termination conduct, *i.e.*, protesting their terminations, sending emails to ManTech managers, and filing wrongful termination claims, as evidence that they "wanted to continue their employment and were not being coerced to remain." Mem. Op. at 40. This inference commits a logical *non sequitur* that is also a legal error.

The relevant question under the TVPRA is whether ManTech used unlawful means to obtain plaintiffs' labor while they were working not whether plaintiffs preferred employment to unemployment after they were fired. These are distinct inquiries. A worker may simultaneously be subjected to coercive conditions during employment and, after being terminated, wish to return to the job that, however coercive, provided his income. The desire to continue being paid is the universal condition of employment. It tells us nothing about whether the conditions of that employment were coercive.

As criminal statutes no longer require a woman to resist as a prerequisite to filing a rape charge, the TVPRA does not require its victims to have tried to escape as a prerequisite to filing a claim under 18 USC 1595. Congress enacted the statute precisely because "traffickers . . . restrain their victims without physical violence or injury" and because "psychologically" coerced workers may appear to be voluntarily working. H.R. Rep. No. 106–939, at 101 (2000). A worker who testifies that he was "the

happiest" person at the worksite may simultaneously have been coerced to remain through financial penalties, passport confiscation, and manufactured legal vulnerability. These characterizations address disposition, not coercion.

The District Court's reliance on post-termination wrongful termination claims is particularly strained. All five plaintiffs brought wrongful termination actions against ManTech. The court treated this as evidence they wanted to stay and were therefore not coerced. But a wrongful termination claim asserts that the employer had no right to discharge the employee without cause; it says nothing about whether the conditions of employment before discharge were coercive. The two claims are not only compatible, they are entirely distinct. Under *Reeves*, the court was required to draw the inference in plaintiffs' favor: that plaintiffs protested because they had endured coercive conditions and expected full compensation for having done so. 530 U.S. at 150–51. It is for a jury to weigh the indignity of a wrongful termination against the evidence of coercion and damage inflicted upon the mechanics.

## VI. ManTech's Overtime Disclaimer is Void Under Both Governing Legal Regimes; the District Court's Contrary Ruling Creates an Legal Vacuum and Revives the Discredited Classical Contract Doctrine That the Supreme Court and Congress Repudiated Nearly Ninety Years Ago

The District Court's grant of summary judgment on the overtime element of the plaintiffs' TVPRA claims rests on a premise that is legally impossible regardless of which sovereign's law governs. The employment relationship between ManTech and the plaintiffs had exactly two candidates for governing law: the law of the United States

or the law of Kuwait. Under *either* regime, ManTech's declaration that it would not pay overtime is void. It is void under U.S. law because the Fair Labor Standards Act makes overtime mandatory and non-waivable - a protection that survives any employer disclosure of intent to deny it. It is void under Kuwaiti law because Article 66 of Kuwait's Private Sector Labor Law No. 6 of 2010 independently mandates overtime compensation as a matter of sovereign public law that no private employment contract may displace. The District Court's analysis can be sustained only if one accepts a third proposition that does not exist in any legal system: that neither nation's law applies, and that ManTech's contractual disclaimer substitutes for both. That proposition is not a legal argument. It is a demand for impunity.

A.   Under U.S. Law, the FLSA's Overtime Protections Are Mandatory and Cannot Be Disclaimed.

The FLSA was enacted to "protect certain groups of the population from substandard wages and excessive hours" arising from the "unequal bargaining power as between employer and employee." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945). To accomplish that purpose, Congress made the statute's minimum standards non-waivable: "FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute." *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981). Neither wages owed nor statutory damages for withholding them "are capable of reduction by compromise of controversies over coverage." *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 116 (1946).

A worker who is told before signing an employment contract that overtime will not be paid has not waived those protections - he has been placed in the precise position of structural disadvantage that the statute was enacted to address. The coercive character of such an announcement is not diminished by advance notice; it is confirmed by it. And as the District Court itself has recognized, "the typical tenets of contract law do not apply" to FLSA wage claims. *Lucas v. Guzman*, Civil Action No. 21-0296 (ABJ) (D.D.C. May 23, 2022) (quoting *Sarceno v. Choi*, 66 F. Supp. 3d 157, 167 (D.D.C. 2014)).

B. <u>Under Kuwaiti Law, Articles 64, 66, and 115 Mandate Overtime and Render Any Contractual Disclaimer Void — and Congress Designed the FLSA's Overseas Exemption on That Assumption</u>.

If Kuwaiti law governs - the precise premise on which ManTech escapes FLSA jurisdiction under 29 U.S.C. § 213(f) - Kuwait's labor law imposes overtime obligations with the same mandatory force. Article 64 of Kuwait's Private Sector Labor Law No. 6 of 2010 establishes the baseline: a labourer "shall not be made to work for more than 8 hours a day or 48 hours a week." Article 66 then requires that any work performed beyond those standard hours be compensated at a rate exceeding the ordinary wage "by 25%," and further mandates that the employer "keep a special record for the overtime work hours" - *See generally*, PEx.A, EXPERT OPINION ON KUWAITI

LAW ISSUES, Prepared by Zafar Iqbal and Khalid Hameed Ahmed, Doc. 134-1, 63-74, and PEx.B, Kuwait Private Sector Law at Doc. Doc. 134-1, 75-157.[27]

Critically, Kuwait law does not merely prescribe overtime compensation; it forbids contracting around it. Article 6 of Law No. 6 of 2010 states that "the provisions of this law shall represent the minimum limit for the labourers' rights" and that any contrary agreement is void. Article 115 (2) reinforces this with precision: "Any conditions or agreement signed before or after the enforcement of this law under which the labourer waivers any right granted by this law shall be deemed null and void." Kuwait's National Assembly spoke in the same voice as the U.S. Congress. ManTech's pre-employment declaration that overtime would not be paid was void under Kuwaiti law the moment it was made - not because of any idiosyncrasy of Kuwaiti labor policy, but because the non-waivability of minimum labor standards is a universal feature of

---

[27] The District Court stated, "what was lawful or illegal at the time under Kuwaiti law is a legal issue for the Court to determine, not a factual question to be resolved by a jury." Mem. Op., 2. This is an incorrect description of the District Court's role. The Mechanics postulated a different kinetic in their opposition to ManTech's motion for summary judgment and repeat it here: "As Plaintiffs understand the process, the Court will instruct the jury as to what Kuwait's laws are and the jury will make the determination of whether those laws were, in fact, abused by ManTech in a manner prohibited by the TVPRA." P, LCvR 7 (h), Counterstatement, Objection 4. The Mechanics also stated, "[s]hould the Court require additional information regarding the expectations of Kuwaiti law, Plaintiffs request that the Court delay its consideration of summary judgment. *See Eshel v. Comm'r, 831 F.3d 512* (D.C. Cir. 2016). Plaintiffs Kuwait law expert witnesses Zafar Iqbal and Khalid Ahmed are available as resources for the Court."

modern labor legislation, reflecting the same recognition of structural power imbalance as the FLSA.

The entire legal architecture of the FLSA's overseas exemption confirms that this was Congress's assumption. When Congress enacted 29 U.S.C. § 213(f) through the Overseas Labor Standards Amendments of 1957, the Senate Report made clear that the exemption rested on the assumption that host-country law already protected overseas workers. S. Rep. No. 85-987 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1756, 1757. *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 286 (1949). The displacement of U.S. labor law in overseas settings was never a displacement of labor law as such. Instead, it was a transfer of regulatory authority to the host sovereign. Kuwait exercised that authority through Articles 64, 66, and 115. ManTech cannot invoke Kuwait's sovereign authority to defeat U.S. jurisdiction and then deny that Kuwait's sovereign labor law binds it.

C. "Choice of Law" Is a Choice Between Competing Legal Systems — Never a Choice Between Law and No Law.

The proposition that neither nation's law governs contradicts the most foundational principle of conflicts jurisprudence. "Choice of law" has always meant a choice between sovereign legal systems; it has never meant a choice between law and lawlessness. Every framework courts have applied to international employment disputes - the Restatement (Second) of Conflict of Laws § 196; the Supreme Court's multi-factor test in *Lauritzen v. Larsen*, 345 U.S. 571, 583-93 (1953), and the flag-state

doctrine of *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963) - presupposes that the inquiry ends with the identification of a governing sovereign, not with a declaration that none governs. The displacement of one nation's law has always been premised on the affirmative presence of another sovereign's law. A choice-of-law analysis that produces no governing law is not an analysis. It is an abdication.

The consequence of the District Court's abdication falls entirely on the plaintiffs. ManTech is a sophisticated defense contractor retaining every procedural and constitutional protection of the U.S. legal system it invokes to resist the FLSA's reach. The plaintiffs are former mechanics who performed hazardous work in Kuwait, were terminated after raising objections, and seek to vindicate rights that two national legislatures independently mandated by law. In the legal purgatory the District Court has created, ManTech faces no binding legal constraint on its wage practices - neither the FLSA it escaped by taking work overseas, nor the Kuwaiti statute that should have governed in the FLSA's place. That asymmetry is the inevitable consequence of allowing an employer to invoke competing sovereignties selectively, claiming the benefit of each and the burden of neither.

D.  The District Court's Reasoning Resurrects the Classical Contract Doctrine That *West Coast Hotel* Rejected.

The District Court's finding that the plaintiffs' pre-employment awareness of ManTech's overtime policy negated the serious-harm element of their TVPRA claim

has antecedents: dark ones. It is, in substance, a reassertion of the *Lochner* doctrine: the proposition, dominant in the early twentieth century and decisively repudiated, that employment contracts freely entered into by employer and employee represent a valid exercise of freedom of contract that courts must enforce, regardless of the structural conditions that rendered such freedom illusory. *See Lochner v. New York*, 198 U.S. 45 (1905). The Supreme Court rejected that premise definitively in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 398-99 (1937), recognizing that the "exploitation of a class of workers who are in an unequal position with respect to bargaining power" is precisely the evil that legislatures may constitutionally correct, and that contractual arrangements reflecting that inequality are not expressions of free will entitled to judicial enforcement. Congress acted on that recognition the following year by enacting the FLSA - mandatory, non-waivable protections that survive any employer disclosure of intent to deny them, because such disclosures are themselves the product of the power imbalance the statute was designed to eliminate. *Brooklyn Sav. Bank*, 324 U.S. at 706. The Kuwaiti National Assembly acted on precisely the same recognition, using identical language, when it enacted Articles 6 and 115(2) of Law No. 6 of 2010.

The plaintiffs in this case occupied a position of far greater structural vulnerability than the domestic workers whose coerced agreements the *Lochner* Court enforced. They were overseas mechanics in Kuwait, bound by contracts executed without counsel, without union representation, and unable to leave without the threat of forfeiting earned wages. To hold that their pre-employment acknowledgment of

ManTech's overtime policy constitutes a legally operative assumption of risk sufficient to defeat a federal anti-trafficking claim at summary judgment is not the application of modern labor law. It is *Lochner*, transposed to the desert.

E.    The District Court's Own Precedent Refutes the Logic It Used in Granting Summary Judgment.

The internal inconsistency of the District Court's position is sharpest when measured against its own decision in *Lucas v. Guzman*, Civil Action No. 21-0296 (ABJ) (D.D.C. May 23, 2022). There, the same court correctly held that FLSA wage rights are "mandatory and generally not subject to bargaining, waiver, or modification by contract or settlement," and that "the typical tenets of contract law do not apply." *Id.* (quoting *Sarceno*, 66 F. Supp. 3d at 167). On that basis, the court denied summary judgment to the employer despite the employee's execution of a comprehensive written release - negotiated with the benefit of legal counsel - that expressly purported to relinquish "all other claims and liabilities whatsoever." The court held that FLSA wage rights survived even that release because the typical tools of contract enforcement cannot be deployed to nullify statutory protections enacted to address structural power imbalances in the employment relationship. Kuwait's Article 115(2) reflects the identical legislative judgment in identical terms: any agreement under which a labourer waives a right granted by the law "shall be deemed null and void." Both the United States and the Kuwait legislatures drew the same line. The District Court honored that line in *Guzman* and erased it in *Hawkins*.

The gap between *Guzman* and *Hawkins* is not a distinction, it is a contradiction. The employee in *Guzman* was a domestic federal worker with counsel, union representation, and full access to U.S. legal process; she signed a formal release with a lawyer present, yet the court held her FLSA rights survived. The plaintiffs here were overseas mechanics without counsel, without union representation, and without practical access to legal redress. ManTech did not secure a formal release. Instead, it simply announced that overtime would not be paid. Under both U.S. and Kuwaiti law, that announcement had no legal effect. The court cannot hold in *Guzman* that the greater is insufficient *i.e.*, a formal, counseled, comprehensive written release does not extinguish FLSA wage rights - while holding simultaneously in *Hawkins* that the lesser suffices: an employer's unilateral declaration eliminates TVPRA serious-harm liability. Either employer disclosure and employee awareness defeat statutory worker protections, in which case *Guzman* was wrongly decided, or they do not, in which case the District Court's analysis in *Hawkins* cannot stand. The judgment below should be reversed.

**VII.  Because of ManTech's False Certification of Compliance with Material Terms of the Contract and, thus, Material Conditions of Payment, This Court Must Reinstate the False Claims Act Claims of Count V of the Third Amended Complaint.**

This Court reviews the dismissal of Count V *de novo*. The District Court's dismissal rested on a single, identifiable legal error: it applied the wrong standard. Under the controlling D.C. Circuit standard established in *United States v. Science*

*Applications International Corporation* ("*SAIC*"), 626 F.3d 1257, 1269 (D.C. Cir. 2010), an implied false certification claim requires only that a contractor "withheld information about its noncompliance with material contractual requirements" — not, as the District Court held, that the contractor's invoices or communications contain "specific representations about the . . . services provided" as they relate to the specific statutory violation. That "specific representations" language comes from *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 190 (2016), which expressly left open whether that condition is required. In the D.C. Circuit, it is not. "A claim that 'merely demand[s] payment,' as opposed to one that makes specific representations about goods or services provided, is sufficient to provide a basis for an implied false certification claim." *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 651 F. Supp. 3d 95, 176 (D.D.C. 2023) (citing *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-cv-1094, 2017 WL 1422364, at *19 n.23 (D.D.C. Apr. 19, 2017)) (the *SAIC* standard "remains unchanged" after *Escobar*). *Escobar*

The District Court itself found, twice, that "compliance with the TVPRA was material to the government's payments to ManTech." Doc. 49, 21-22; Doc. 105, 40. That materiality finding, combined with the *SAIC* standard, resolves Count V. The inquiry reduces to two questions: did ManTech withhold information about noncompliance with material contractual requirements, and did it submit payment claims while doing so? Both answers are unequivocally yes. The MRAP Contract incorporated FAR 52.222-50's zero-tolerance policy for TVPRA violations, prohibited

passport confiscation, required compliance with Kuwaiti immigration and labor law, imposed on ManTech *an affirmative contractual duty* to immediately report violations to the Contracting Officer, and authorized suspension of contract payments for noncompliance. TAC ¶¶ 290–296. ManTech violated every one of these provisions — trafficking its workforce into Kuwait illegally, confiscating their passports, refusing to secure Visa 18 work authorization, compelling illegal "visa runs," and imposing 72-hour workweeks in violation of Kuwaiti law. TAC ¶¶ 152–200. Rather than fulfill its disclosure duty, ManTech generated false records to actively conceal those violations from the Contracting Officer with authority to suspend payment for them. TAC ¶¶ 307–315. Throughout, ManTech submitted invoices and accepted successive contract option periods under a $2.85 billion contract, TAC ¶¶ 23, 32, 304, withholding the very information that would have entitled the government to withhold payment. Under *SAIC*, Count V states a claim.

The District Court separately erred by failing to analyze Count V's independent claim under 31 U.S.C. § 3729(a)(1)(B), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Count V expressly pleaded both § 3729(a)(1)(A) and § 3729(a)(1)(B). TAC at 63. Section 3729(a)(1)(B) is "designed to prevent those who make false records or statements . . . from escaping liability solely on the ground that they did not themselves present a claim for payment." *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004). False records

need not be invoices — they must be material to payment. The District Court's entire analysis addressed the *Escobar* implied-certification theory and concluded that the four letters were "not themselves invoices or requests for payment." Mem. Op. at 40. That is the analysis for § 3729(a)(1)(A). The December 10, 2012 letter from ManTech Vice President Fisne to Contracting Officer Bursey falsely asserted compliance with Kuwaiti labor law in direct response to the Army's specific compliance inquiry, TAC ¶¶ 176–177, 309, addressed to the very officer empowered to suspend payments for TVPRA noncompliance under KSCR1-2(c)(3). The December 20, 2012 and January 3, 2013 letters to Host Nations Affairs, and the November 26, 2012 letter drafted by ManTech and caused to be transmitted under a U.S. Army representative's signature, TAC ¶¶ 175, 308, 310, 312, were the scaffold of the Millbrook concealment scheme - false records material to ManTech's continued receipt of payment. Under § 3729(a)(1)(B), a defendant is liable for causing false records "to be made or used," even when another party ultimately executes them. Each letter satisfies every element of § 3729(a)(1)(B); the District Court never analyzed them under that provision.

The District Court's final rationale — that misrepresentations about employer identity and overtime compliance were not "the tools of the unlawful coercion at the heart of the statute" — has no basis in the FCA. *SAIC* and *Escobar* ask whether the contractor withheld information about material noncompliance. Neither imposes a further requirement that the withheld information concern the specific coercive mechanism of the underlying tort. Moreover, the form of the false representation is

legally irrelevant: "[s]o long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach." *Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*, 512 F. Supp. 3d 1096, 1118 (D. Haw. 2021). The FCA's scienter standard for implied certification requires proof that the defendant knew (1) that it violated a contractual obligation, and (2) that compliance was material to the government's decision to pay. *SAIC*, 626 F.3d at 1271. ManTech's own Division Vice President acknowledged in writing that 46 employees were illegally present in Kuwait and that "the Government will notice . . . soon," TAC ¶ 167, and its Senior Vice President personally approved the money-laundering scheme to conceal violations from governmental detection, TAC ¶ 192. Both elements of scienter are established at the highest level of ManTech's corporate hierarchy.

Finally, if this Court reinstates the Count IV TVPRA claim — as the Mechanics respectfully submit it must — Count V FCA liability follows directly. The District Court has already found TVPRA compliance material to payment. ManTech's knowing TVPRA violations, established on appeal, confirm that every invoice submitted during the violation period was an impliedly false certification of compliance with a material contractual requirement. The False Claims Act claims of Count V must be reinstated.

## CONCLUSION

For the afore-discussed reasons, the District Court's summary judgment on Count IV and its dismissal of Count V of the TAC should be reversed and vacated; and the case remanded with instruction for the District Court to set a trial date consistent with the Mechanics' Seventh Amendment rights under the United States Constitution.

Respectfully submitted,

/s/ Joseph A. Hennessey
Joseph A. Hennessey, Esq.
DC Bar No. 453582
Attorney for Plaintiff-Appellants
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, MD  20185
240-235-5040
jhennessey@jahlegal.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,142 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). Certified this Wednesday, April 15, 2026.

/s/ Joseph A. Hennessey

Joseph A. Hennessey, Esq.
DC Bar No. 453582
Attorney for Plaintiff-Appellants
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, MD  20185
240-235-5040
jhennessey@jahlegal.com

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2026, a copy of the foregoing were served via electronic mail upon the following via email as agreed by the parties. The undersigned also certifies that he will cause eight (8) true and correct copies of the Corrected brief to be transmitted to the Clerk of this Court by hand delivery. By email received on April 14, 2026, Counsel for Appellee Counsel for ManTech International Corporation and ManTech Telecommunications Information Systems Corporation have waived service of printed copies of the brief.

<u>/s/ Joseph A. Hennessey</u>
Joseph A. Hennessey, Esq.
DC Bar No. 453582
Attorney for Plaintiff-Appellants
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, MD  20185
301-351-5614
jhennessey@jahlegal.com